Maria Marie **ARRINGTON, Individual-ly; Estate of Harold E. Arrington, Deceased; Tisha Maunaala Arrington, a minor, a nfr Maria Marie Arrington; Estate of Haroldlind Kealapulani Fitzgerald, Deceased; Pearl Momilani Arrington; Charlotte Nalani Parks; Lynnette Leilani Arrington; Harold Edward Arrington, Jr.; Kelly Arrington; Ardella Ahloha Arrington; Eric Anthony Arrington; Derek Bruce Arrington; Michelle Lehua Maliafau; Natalie Pulani Lopa; Lealoha; Solomon Samuel Kaluna; Michelle Lehua Malafau, Plaintiffs–Appellants,**

v.

**Norbert B. WONG, M.D; The Emergency Group, Inc.; The Queen's Medical Center; City and County of Honolulu; Clarence Uyema, EMT; Jerry Ho, EMT, Defendants–Appellees.**

No. 98–17135.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 2000

Filed Jan. 22, 2001

---

Magali V. Sunderland and Hilary Benson Ganges, Trecker & Fritz, Honolulu, Hawaii, for the plaintiff-appellants.

Peter C.-P. Char and Deborah A. de Quevedo, Char, Hamilton Campbell & Thom, Honolulu, Hawaii, for defendants-appellees Norbert B. Wong, M.D. and the Emergency Group, Inc.

William S. Hunt, Ellen Godbey Carson, and Jason H. Kim, Alston Hunt Floyd & Ing, Honolulu, Hawaii, for defendant-appellee The Queen's Medical Center.

Thomas E. Cook, Lyons, Brandt, Cook & Hiramatsu, Honolulu, Hawaii, for defendants-appellees City and County of Honolulu, Clarence Uyema, EMT, and Jerry Ho, EMT.

Before: CANBY, Jr., REINHARDT, and FERNANDEZ, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge FERNANDEZ.

REINHARDT, Circuit Judge:

We are required on this appeal to construe the language of·the Emergency Medical Treatment and Active Labor Act of 1986 (EMTALA), 42 U.S.C. § 1395dd, as implemented by 42 C.F.R. § 489.24. EMTALA prevents transfers, without stabilizing treatment, of patients who "come to" a hospital's emergency room. The complaint alleges that: (1) decedent Harold E. Arrington suffered a heart attack on his way to work; (2) in the ambulance, on the way to the Queen's Medical Center (Queen's hospital), the emergency personnel radioed ahead to advise the hospital's emergency room of their imminent arrival; (3) Dr. Norbert Wong, the emergency room doctor on duty, redirected the ambulance to a different hospital five miles away from Queen's; and (4) Mr. Arrington died soon after arrival at the more distant hospital. The issue before us is whether the plaintiffs have stated a claim under EMTALA on the basis of the defendants' failure to provide emergency treatment to Mr. Arrington.

## I. Background[1]

On May 5, 1996, at approximately 11:30 p.m., Harold Arrington (Arrington) was

---

[1] For purposes of this appeal from the district court's dismissal of the complaint, we must assume the facts as alleged in the complaint to be true. *See Enesco Corp. v. Price/Costco, Inc.,* 146 F.3d 1083, 1085 (9th Cir.1998).

driving to his job as a security guard when he experienced difficulty breathing. One of his co-workers called for an ambulance; it arrived shortly after midnight. The ambulance left the scene at 12:24 a.m. to take Arrington to the closest medical facility, the Queen's Medical Center (Queen's hospital).

Dr. Norbert Wong was the emergency room physician on duty at Queen's hospital. While under way, the ambulance personnel contacted the hospital emergency room by radio. They relayed the details of Arrington's medical condition to Dr. Wong. Arrington was "in severe respiratory distress speaking 1–2 words at a time and . . . breathing about 50 times a minute." Dr. Wong asked the ambulance personnel who was the patient's doctor. The ambulance personnel replied "patient is a Tripler [Army Medical Center] patient, being that he was in severe respiratory distress we thought we'd come to a close facility." Dr. Wong responded: "I think it would be okay to go to Tripler." The ambulance personnel took this as a directive and changed their route so as to proceed to the more distant hospital. By the time the ambulance arrived at Tripler it was 12:40 a.m. and Arrington's condition had deteriorated. He was pronounced dead at 1:17 a.m.

On May 18, 1998 plaintiffs filed an amended complaint in federal district court against three sets of defendants: (1) Dr. Wong and his employers, the Emergency Group., Inc.; (2) the emergency personnel, Clarence Uyema and Jerry Ho, and their employers, the City and County of Honolulu; and (3) The Queen's Medical Center. The amended complaint alleged, among other things, a violation of the Emergency Medical Treatment and Active Labor Act of 1986 (EMTALA). Subsequently, Queens filed a Rule 12(b)(1) motion to dismiss (lack of subject-matter jurisdiction), Wong and The Emergency Group filed a Rule 12(b)(6) motion to dismiss (failure to state a claim), and the City and County of Honolulu, Clarence Uyema and Jerry Ho filed a motion for judgment on the pleadings under Rule 12(c). The dis-

trict court heard all three motions on September 21, 1998, and two days later filed its order. It granted the defendants' motions and dismissed the plaintiffs' complaint on the ground that, for the purposes of EMTALA, Arrington had never "come to" Queens emergency department. The court concluded that EMTALA applied only in the case of a patient's "physical presence" in the emergency room. *See Arrington v. Wong,* 19 F.Supp.2d 1151, 1156 (1998). This appeal ensued.

## II. Standard of Review

We review de novo a district court's dismissal of a complaint: for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), *see Partnership Exch. Sec. Co. v. NASD,* 169 F.3d 606, 608 (9th Cir.1999); for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), *see Hodge v. Dalton,* 107 F.3d 705, 707 (9th Cir.1997); and for judgment on the pleadings pursuant to Rule 12(c). *See Fajardo v. County of Los Angeles,* 179 F.3d 698, 699 (9th Cir.1999).

## III. Analysis

To provide emergency treatment to indigent and uninsured patients, Congress enacted the Emergency Medical Treatment and Active Labor Act of 1986 (EMTALA), commonly known as the Patient Anti–Dumping Act, 42 U.S.C. § 1395dd, to prevent "hospitals . . . 'dumping' [indigent] patients . . . by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *James v. Sunrise Hosp.,* 86 F.3d 885, 886 (9th Cir.1996) (quoting *Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1255 (9th Cir.1995) (internal quotation marks omitted)). *See also Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039 (D.C.Cir.1991) (stating that EMTALA passed amid growing reports in the 1980's of hospitals denying emergency health care services to the poor and uninsured). The provisions of EMTALA are not limited to the indigent and uninsured,

however. "Because [EMTALA] is clear on its face, we have held 'that the Act applies to any and all patients, not just to patients with insufficient resources.'" *James,* 86 F.3d at 887 (quoting *Brooker v. Desert Hosp. Corp.,* 947 F.2d 412, 414 (9th Cir. 1991)).

Under EMTALA, for those hospitals with an emergency department: "if any individual ... *comes to* the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a) (emphasis added). If, after screening, the hospital determines that an emergency medical condition exists, the hospital generally may not transfer the patient without stabilizing his condition. *Id.* § 1395dd(b)(1)(A). In the case before us, the question we must decide is whether Arrington's attempt to reach the hospital falls within the scope of EMTALA's "comes to" language.

▇▇▇▇ To do so, we must first determine whether the language of EMTALA is sufficiently clear to apply without interpretation. In the ordinary case, courts simply apply the unambiguous terms of a statute to the case before them. *See Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). If the language of the statute is not clear on its face, courts examine the specific and general statutory context in which the phrase is used in an effort to discern a determinate meaning. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself,

the specific context in which that language is used, and the broader context of the statute as a whole"); *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991); *see also Brown v. Gardner,* 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context."); *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) ("[T]he meaning of statutory language, plain or not, depends on context"). When a "statute is silent or ambiguous with respect to the specific issue," courts will generally interpret the statute, unless an agency with the power to construe the statute has already provided a construction. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. In that circumstance, the court must determine whether the agency's interpretation is "permissible:" if so, that interpretation applies. *Id.* Where Congress expressly delegates to an agency the power to construe a statute, we review the agency's interpretation under the "arbitrary and capricious" standard; where delegation is implicit, the agency's interpretation must be "reasonable." *Id.* at 843–44, 104 S.Ct. 2778; *see also FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 157–159, 120 S.Ct. 1291, 1314, 146 L.Ed.2d 121 (2000).

▇▇▇▇ In the instant case, appellees urge in their briefs that the phrase "comes to the emergency department" in § 1395dd(a) plainly and unambiguously means "arrives at a hospital." At oral argument, they again acknowledged that the provision at issue encompasses the entire hospital and its grounds, not just the "emergency department." Appellants, however, interpret the phrase to include the act of traveling to the hospital.[2] Webster's Third New International Dictionary supports both definitions. It defines "come[s] to" as,

---

2. Neither side asserts that a patient must literally fight his way through all obstacles so as to physically enter the emergency department before § 1395dd(a) applies.

among other things, to "move toward or away from something ... APPROACH," or "to arrive at a particular place." *Webster's Third New International Dictionary of the English Language Unabridged,* 453 (Philip Babcock Gove, ed.1986).[3] Purely as a matter of dictionary definition, comes to the emergency department could mean either physical arrival at the emergency room or the act of traveling from the scene of an emergency to or towards the hospital. Thus, all agree that the statutory provision may not simply be applied: rather it must be construed by an appropriate body.

Our reading of the statute as a whole leaves it uncertain precisely what § 1395dd(a) contemplates: whether Congress required that an emergency patient be present at the emergency room, that the person be on the hospital grounds, or in a hospital-owned ambulance; or whether, as in this case, it is sufficient that the patient be on his way to the hospital in a non-hospital-owned ambulance.[4] In short, we cannot say that the statute is unambiguous.[5] Accordingly, following *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778, rather than construe the statute ourselves, we must defer to an agency's permissible interpretation, if one exists, of ambiguous statutory terms. In this case, and pursuant to its authority under 42 U.S.C. §§ 1302 and 1395hh, the Department of Health and Human Services has promulgated a regulation interpreting § 1395dd(a)'s "comes to the emergency department" language. *See* 42 C.F.R. § 489.24.

■ Administrative agency regulations interpreting the rule "will often suffice to clarify a standard with an otherwise uncertain scope." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 504, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). "Administrative interpretation and implementation of a regulation are ... highly relevant to our analysis ... [and] a federal court must ... consider any limiting construction that a[n] ... enforcement agency has proffered.'" *City of Chicago v. Morales,* 527 U.S. 41, 92 n. 10, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 795–96, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

The Department of Health and Human Services has taken an expansive approach to the scope of the phrase "comes to the emergency department." *See* 42 C.F.R.

---

3. Webster's New World Dictionary defines "come" as, among other things, "to move from a place thought of as 'there' to a place thought of as 'here': a) in the second person, with regard to the speaker *[come* to me, will you *come* to the dance tonight?*] ...* c) in the third person, with regard to the person or thing approached, *[* he *came* into the room*]* [;] to approach or reach by or as by moving toward[;] to arrive or appear." Webster's New World Dictionary of American English, 278 (Victoria Neufeldt, David B. Guralnik, eds., 3d Collegiate ed.1988). The Modern Oxford dictionary defines come as, in part, "move, be brought towards, or reach a place thought or as near or familiar to the speaker or hearer." Oxford Modern English Dictionary, 191 (Della Thompson, ed., 2d ed.1996). Thus, all three dictionary definitions include the differing usages suggested by the parties.

4. Moreover, the ambiguity is not resolved by choosing between the alternatives proposed by the parties. While "travel towards" leaves open the problem of when the journey begins, "arrived at" poses the problem of where it is

to end. Even adopting the "arrived at" definition, a patient may satisfy the language of the statute by arriving at a variety of locations, from the emergency room itself, to an ambulance owned by a hospital. *See* 42 C.F.R. § 489.24, *see also, e.g., McIntyre v. Schick,* 795 F.Supp. 777, 781 (E.D.Va.1992) (eschewing a literal reading of § 1395dd's "comes to the emergency department," instead preferring to include all areas of the hospital within the definition of emergency department).

5. On this point, Justice Scalia's counsel proves helpful: "If Chevron is to have any meaning, then, congressional intent must be regarded as 'ambiguous' not just when no interpretation is even marginally better than any other, but rather when two or more reasonable, though not necessarily equally valid, interpretations exist. This is indeed intimated by the opinion in Chevron-which suggests that the opposite of 'ambiguity' is not 'resolvability' but rather 'clarity.'" Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law,* 1989 Duke L.J. 511, 520.

§ 489.24. The Department interprets that statutory phrase broadly, to include not just the emergency room itself, but all hospital property—sidewalks, outlying facilities, and ambulances—so that once a patient seeking medical treatment presents himself at any facility or vehicle owned or operated by the hospital, he has "come to" the emergency department. *See id.* Under this provision of the regulation, individuals in non-hospital-owned ambulances have unquestionably "come to the hospital" when that ambulance is itself on hospital property. *Id.*

The remaining problem—the problem presented by Arrington's case—is whether hospitals must admit emergency patients who are being transported to the hospital in non-hospital owned ambulances. Specifically, may the hospital's emergency room personnel refuse to treat such patients and divert them to other hospitals when the emergency room is called by paramedics or other ambulance attendants and notified that the patient is en route to the hospital. The regulation answers this question as well. It provides that if ambulance personnel contact the hospital to "inform[ ] the hospital that they want to transport the individual to the hospital for examination and treatment," the hospital may not deny the individual access unless it "is in 'diversionary status,' that is, it does not have the staff or facilities to accept any additional emergency patients." *Id.* In other words, a hospital may not prevent a non-hospital-owned ambulance from coming to the hospital unless it has a valid treatment-related reason for doing

so.[6] Moreover, even if the hospital is in diversionary status, where the ambulance continues to the hospital in spite of an instruction to take the patient elsewhere, that ambulance "comes to" the hospital, and emergency treatment of the patient must be provided. *Id.*

The Department of Health and Human Services clearly recognized that hospitals could abuse the Act simply by diverting all persons in emergency straits, before they arrive on hospital property. Under 42 C.F.R. § 489.24, a hospital cannot avoid its obligation to treat emergency patients simply by preventing individuals in dire straits from reaching the emergency room: in order to engage in such diversions, the hospital must show that it is in "diversionary status"—that is, that it lacks the staff or facilities to treat a patient. This follows the Department's consistent position that "it would defeat the purpose of EMTALA if we were to allow hospitals to rely on narrow, legalistic definitions of 'comes to the emergency department' or of 'emergency department' to escape their EMTALA obligations." EMTALA 65 Fed.Reg. 18,434, 18,522 (April 7, 2000) (to be codified at 42 C.F.R. § 489.24). Accordingly, the Department warned that, under § 1395dd, "a facility may not prevent an individual from gaining access to the facility in order to circumvent the[ ] requirements [of EMTALA]." EMTALA 59 Fed.Reg. 32,086, 32,098 (June 22, 1994) (codified at 42 C.F.R. § 489.24).[7]

 In the instant case, Arrington was in a non-hospital-owned ambulance that was en route to Queen's hospital, and

---

**6.** 42 CFR § 489.24 states, in relevant part:

An individual in a nonhospital-owned ambulance off hospital property is not considered to have come to the hospital's emergency department, even if a member of the ambulance staff contacts the hospital by telephone or telemetry communications and informs the hospital that they want to transport the individual to the hospital for examination and treatment. *In such situations, the hospital may deny access if it is in "diversionary status," that is, it does not have the staff or facilities to accept any additional emergency patients.*

(emphasis added).

**7.** The Department adopted a broad, but compelling, reading of the act, recognizing that § 1395dd "applies to all individuals who attempt to gain access to the hospital for emergency care. *An individual may not be denied services simply because the person failed to actually enter the facility's designated emergency department.* To read the statute in such a narrow fashion would ... frustrate the objectives of the statute and in many cases lead to arbitrary results." 59 Fed.Reg. at 32,098.

the ambulance personnel contacted the hospital's emergency room on his behalf and requested treatment. By the plain language of the agency's rules, the hospital was obliged to treat Arrington unless the hospital was in "diversionary status," or, in other words, lacked "the staff or facilities to accept any additional emergency patients at th[e] time" it was contacted. 42 C.F.R. § 489.24. Here, Queen's hospital has not contended that it was in "diversionary status" at the time Dr. Wong directed Arrington away from Queen's hospital and to the more distant Tripler facility.[8] To be in compliance with EMTALA regulations, Queen's hospital would have to show that there were insufficient emergency staff available to treat Arrington at the time the ambulance personnel called the emergency room; that appropriate staff would not be available by the time Arrington arrived at the hospital; that the hospital did not have the proper equipment with which to treat Arrington's medical condition; or that the appropriate equipment was unavailable (because in use, out of order, etc.). Finally, Queen's hospital would have to demonstrate that Dr. Wong knew that there were inadequate staff or facilities available, and that he based his decision to redirect Arrington to Tripler on a treatment-related reason, rather than on some other unrelated factor.

In dismissing the complaint, the district court relied on two decisions from other circuits it believed to be dispositive. Neither decision, however, is inconsistent with the result we reach here. In *Johnson v. University of Chicago Hosps.*, 982 F.2d 230 (7th Cir.1992) (per curiam), a group of hospitals shared a telemetry system which directed patients to the appropriate emergency facility. *Id.* at 233. When the par-

amedics called for permission to bring the patient to the nearest facility, they contacted the central shared system, which informed them that the nearest hospital had declared a "partial bypass," and directed them to a different hospital within the system. *Id.* at 231. In *Johnson* the Seventh Circuit explicitly held that "a hospital-operated telemetry system is distinct from that hospital's emergency room," and is not governed by § 1395dd. *Id.* at 233.[9] Here, to the contrary, the ambulance carrying Arrington directly contacted the Queen's hospital emergency room; moreover, as noted earlier, there is no contention here that the hospital was on diversionary status.

Nor is our decision inconsistent with the Fifth Circuit's decision in *Miller v. Medical Ctr.*, 22 F.3d 626 (5th Cir.1994). *Miller* held that where the patient was in bed at another medical facility, and a doctor at that facility had, by telephone, requested the hospital to accept his patient for medical treatment, § 1395dd did not apply. *See id.* at 628–629. Arrington, by contrast, was not resting in bed at another facility. He was traveling towards (i.e., coming to) Queen's hospital by ambulance when the ambulance personnel contacted the hospital's emergency department to make arrangements for prompt treatment upon his arrival.

Whichever standard of review we were to apply, the agency's interpretation passes muster. Examining the agency's interpretation under the less deferential "reasonableness" standard, *see Chevron,* 467 U.S. at 843, 104 S.Ct. 2778, it is apparent that this rule is consistent with the language of the statute and effectuates its intent. The "overarching purpose of [EMTALA is to] ensur[e] that patients, partic-

---

8. Although Queen's hospital filed a 12(b)(1) motion-to-dismiss and introduced evidentiary material in support of the motion, Queens is not precluded by this opinion from arguing in proceedings subsequent to our remand of this appeal that it was in diversionary status at the time Arrington was diverted to Tripler. Given the record before us, however, it does not appear likely that such was the case.

9. However, the *Johnson* court left open the possibility that "a hospital could conceivably use a telemetry system in a scheme to dump patients," and suggested that it would reexamine the language and intent of the statute if such an issue were before the court. *Id.* at 233 n. 7.

ularly the indigent and underinsured, receive adequate emergency medical care." *Vargas v. Del Puerto Hosp.*, 98 F.3d 1202, 1205 (9th Cir.1996) (citing *Eberhardt*, 62 F.3d at 1255). The agency's interpretation achieves this purpose, ensuring that emergency patients may be diverted to other hospitals only when the diverting hospital has a valid, treatment-related reason for doing so. The agency's interpretation works no hardship on the hospital. As the Department's regulations note, § 1395dd "only requires hospitals that offer emergency services to provide screening and stabilizing treatment within the scope of their capabilities." EMTALA 59 Fed.Reg. at 32,098. Furthermore, a failure to treat an emergency patient, by diverting him to another hospital, may have lethal consequences. Finally, when a hospital is unable to handle the case-load and is in diversionary status, it may divert emergency patients even if they are in the process of being transported to that hospital because it is the closest. Because the agency's regulation is consistent with the purposes and language of the statute, we find that interpretation reasonable (and certainly not arbitrary or capricious).

## IV. CONCLUSION

The effects of patient dumping on the availability and quality of emergency services for indigent and uninsured patients are well documented. *See* Karen I. Treiger, Note: *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61

N.Y.U. L.Rev. 1186, 1190 (1986) (cited by appellants).[10] Congress has legislated to prevent patient dumping, and the Department of Health has promulgated a regulation applying that legislation to a broad range of cases. We follow the Department of Health's regulation and hold that a hospital may divert an ambulance that has contacted its emergency room and is on its way to that hospital only if the hospital is in diversionary status. The judgment of the district court is hereby REVERSED. The case is REMANDED to the district court for further proceedings consistent with this opinion.

FERNANDEZ, Circuit Judge, Dissenting:

As the majority indicates, the Estate of Harold E. Arrington and a number of family members (collectively "the Estate") brought this action against the Queen's Medical Center, Dr. Norbert Wong, the City and County of Honolulu, Clarence Uyema, and Jerry Ho. The district court dismissed the portion of the action against Queen's which was based on the Emergency Medical Treatment and Active Labor Act (EMTALA). *See* 42 U.S.C. § 1395dd. It held that the Act did not apply. It then dismissed the remaining supplemental state claims. *See* 28 U.S.C. § 1367(c).

If Queen's violated the substantive provisions of EMTALA, any person harmed thereby could sue it for damages for personal injuries. *See* 42 U.S.C. § 1395dd(d)(2)(A).[1] Our task, therefore, is

---

**10.** Treiger discusses three recent studies analyzing patient dumping. *See* Karen I. Treiger, Note: *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y.U.· L.Rev. at 1190–1191. One study reports that eighty-seven percent of hospitals transferring patients cited the lack of insurance as the sole reason for the transfer. *Id.* at 1190 (citing Schiff, Ansell, Schlosser, Idris, Morrison & Whitman, *Transfers to a Public Hospital—A Prospective Study of 467 Patients*, 314 New Eng. J. Med. 552, 553 (1986)). Another study found that, of the patients transferred, over seventy-two percent required emergency services at the receiving hospital. *See id.* at 1190–1191 (citing Andrulis & Gage, *Patient Transfers to Public Hospitals: A National As-*

*sessment* (National Ass'n of Pub. Hosps. Apr. 9, 1986)). A third study found that, of 458 patients transferred to the emergency department of Highland General Hospital in Oakland, sixty-three percent of the transfer patients lacked insurance. There was no evidence patients requested the transfers or that patients were transferred due to lack of beds at the transferring hospital. *See id.* at 1191 (citing Himmelstein, Woolhandler, Harnly, Bader, Silber, Backer & Jones, *Patient Transfers: Medical Practice as Social Triage*, 74 Am. J. Pub. Health 494, 495 (1984)).

**1.** Only a hospital is subject to an action under EMTALA; no other person or entity is. *See*

to decide whether Queen's did violate EMTALA's requirement that "if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department...." 42 U.S.C. § 1395dd(a). More specifically, we must decide if Arrington did come to the hospital. In my opinion, it is plain that he did not.

Congress could have used many different locutions and drawn many different lines when it enacted EMTALA. It could have, for example, said that a hospital could be liable when a request for services was made and somebody was willing and able to bring the person in distress to the hospital. It could have declared that if the person making the request was operating an ambulance heading toward the hospital, the hospital must accept the patient. Congress did not do so. Rather, it said that in addition to a request for services, the person must come to the hospital's emergency department. The plain meaning of that requirement is that a person must be at the hospital physically. It will not do for him to be in contact through electronic connection, or for him or someone else to hold a hope that he can get there. It surely does not mean "move toward;" it clearly means to arrive at the place in question.[2]

As the Supreme Court recently reiterated: " '[a]s in any case of statutory construction, our analysis begins with the language of the statute.... And where the statutory language provides a clear answer, it ends there as well.' " *Harris Trust & Savings Bank v. Salomon Smith*

*Barney Inc.*, 530 U.S. 238, 120 S.Ct. 2180, 2191, 147 L.Ed.2d 187, (2000) (citation omitted); *see also Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 123, 110 S.Ct. 456, 458, 107 L.Ed.2d 438 (1989). Certainly that is entirely true when we do not encounter some " 'rare and exceptional circumstance' " that would, for example, make the plain reading absurd or demonstratively at odds with the statute's purpose. *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981) (citation omitted). We have held the same. *See Oregon Natural Res. Council, Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir.1996); *Tang v. Reno*, 77 F.3d 1194, 1196–97 (9th Cir.1996); *Farr v. United States*, 990 F.2d 451, 455 (9th Cir.1993). The statute at hand is just that plain. In fact, if a request without actual arrival is enough, the "comes to" language is read out of the statute for all practical purposes.[3] That, itself, violates the " 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.' " *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985) (citation omitted). In other words, the plain reading of the "comes to" provision is neither absurd nor demonstratively at odds with the purpose of the statute, which is to prevent the dumping of patients who arrive at the hospital. Again, had Congress wished to do so, it could have drawn the line at some point other than the time when a person comes to an emergency department.

In so stating, I follow the circuits that have spoken to the issue already. *See Miller v. Med. Ctr. of Southwest Louisiana*, 22 F.3d 626, 627–30 (5th Cir.1994) (a

*Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1256–57 (9th Cir.1995).

2. For example, if we say that someone has "come home," we mean that he has arrived. We do not mean that he is on the way; to express that, we would say that he is "coming home." If we say come to court at 9:00 a.m., we mean "be here," we do not mean "be in route."

3. At the very least, a plain statutory command becomes subject to an endless series of amendments, each created by well-meaning judges (or regulators) who seek to solve a problem that Congress did not. That ad hoc and serial amending process then creates a quagmire of uncertainty for hundreds of hospitals, and those who run them.

rejected request to transfer an emergency patient to a hospital did not violate EMTA-LA because the patient never arrived there); *cf. Johnson v. Univ. of Chicago Hosps.*, 982 F.2d 230, 233 & n. 7 (7th Cir.1992) (where a patient never came to the hospital for medical assistance, she never crossed the threshold of liability, but an ambulance was not in touch with the emergency department). Other courts which have not specifically decided the issue have nevertheless read the language to mean that the patient has entered or arrived at the hospital itself. *See Bryan v. Rectors & Visitors of Univ. of Virginia*, 95 F.3d 349, 351 (4th Cir.1996); *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir.1995); *Green v. Touro Infirmary*, 992 F.2d 537, 539 (5th Cir.1993); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 269 (6th Cir.1990).

The Estate argues that two courts have, indeed, expanded the "comes to" language. I disagree. In both of those cases, the courts were focusing on the treatment portion of the statute. *See* 42 U.S.C. § 1395dd(b). That section prevents the dumping of an emergency patient, who has already come to the hospital, but who may not be in the emergency room itself. *See Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1135 (6th Cir.1990); *McIntyre v. Schick*, 795 F.Supp. 777, 780–81 (E.D.Va.1992); *see also Lopez–Soto v. Hawayek*, 175 F.3d 170, 174 (1st Cir.1999). In neither of those cases was the court required to concern itself about whether the patient was at the hospital; she was.

The final string to the Estate's bow is a regulation issued by the Department of Health and Human Services, which rather than adding clarity adds an ambiguity. The regulation first states that a person has "come to" an emergency department if he is on hospital property, including an ambulance "owned and operated by the hospital." 42 C.F.R. § 489.24(b). It goes on to say that a person in a "nonhospital-owned" ambulance has not come to the emergency department "even if a member of the ambulance staff contacts the hospital by telephone or telemetry communications and informs the hospital that they want to transport the individual to the hospital for examination and treatment." *Id.* So far so good—at least a coming to hospital property of some kind is clearly required.[4] But the regulation then adds "[i]n these situations, the hospital may deny access if it is in 'diversionary status,' that is, it does not have the staff or facilities to accept any additional emergency patients." *Id.*[5] The Estate reads this latter sentence to mean that in all other instances the hospital is forbidden to deny access. Therein lies the ambiguity, but I do not read the regulation the way the Estate does. Rather, I read it to set forth an instance when the hospital may deny access, without attempting to indicate that the hospital may deny access in that situation only.

At any rate, if the regulation does constitute an attempt to make a mere request for services unaccompanied by an actual arrival at the hospital sufficient to bring the hospital within the strictures of EM-TALA, I would find the regulation itself to be invalid. Where, as here, the intent of Congress is clear "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *see also Lujan–Armendariz v. INS*, 222 F.3d 728, 749 (9th Cir.2000). Of course, in that respect, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9. So it is here. The agency simply does not have

---

**4.** For purposes of this case, I assume, without deciding, that being somewhere on hospital property is a sufficient coming to the emergency department.

**5.** If the ambulance, nevertheless, brings the patient to the hospital, he has come to it and EMTALA applies. *Id.*

the authority to extend the statute beyond the plain limits set by Congress. Nor does this court, by the way.

Congress does not always express itself with great lucidity. But there is nothing lutaceous about the language that we are called upon to construe here. It takes no great conning of the phrase "comes to" as used in this statute to discover that it means to physically arrive at the hospital. That being so, the Estate has no cause of action under EMTALA because Harold Arrington never did come to Queen's. If the Estate is to recover damages for what it sees as improper conduct, it must seek those in state court based upon state causes of action.[6]

Therefore, I respectfully dissent.

6. It was not an abuse of discretion to dismiss the state claims once the only federal claim was dismissed at this early stage of the litigation. *See* 28 U.S.C. § 1367(c); *Fang v. United States,* 140 F.3d 1238, 1241 (9th Cir.1998); *Executive Software N. Am., Inc. v. United States District Court,* 24 F.3d 1545, 1555–56 (9th Cir.1994).