410 F.Supp.2d 939 (2005)
Dwayne L. LOPES, Plaintiff,
v.
KAPIOLANI MEDICAL CENTER FOR WOMEN & CHILDREN, Dew-Anne Langcaon, Chief Operating Officer, Kapiolani Medical Center for Women & Children, Jen Chahanovich, Director, Respiratory Care and Rehabilitation Services, Kapiolani Medical Center for Women & Children, John Does 1-5, and Jane Does 1-5, Defendants.
No. CIV. 03-00658ACKLEK.
United States District Court, D. Hawai`i.
August 11, 2005.
*940 Jerry P.S. Chang and Clayton C. Ikei, Honolulu, HI, for Plaintiff.
Malia E. Kakos, Melanie M. May, Barry W. Marr, Marr, Hipp, Jones & Wang, LLP, Honolulu, HI, for Defendants.
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS KAPIOLANI MEDICAL CENTER FOR WOMEN & CHILDREN, DEW-ANNE LANGCAON, AND JEN CHAHANOVICH'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S CLAIM OF RETALIATION IN VIOLATION OF THE EMTALA (FIRST CLAIM FOR RELIEF) AND DENYING DEFENDANTS KAPIOLANI MEDICAL CENTER FOR WOMEN & CHILDREN, DEW-ANNE LANGCAON, AND JEN CHAHANOVICH'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S CLAIM OF RETALIATION IN VIOLATION OF THE HAWAII WHISTLEBLOWERS' PROTECTION ACT AND FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (PLAINTIFF'S SECOND AND THIRD CLAIMS FOR RELIEF)
KAY, District Judge.

BACKGROUND
I. Factual History
Defendants assert that Kapiolani Medical Center for Women and Children ("Karpiolani") *941 is a full spectrum maternal and child tertiary medical center. (Defs.' Mot. at 3). The purpose of the Transport Team is to provide support and appropriate medical intervention in the transport of neonatal and pediatric patients throughout the State of Hawaii and the Pacific Rim. (Defs.' Mot. at 3). Patients are transported by ambulance, helicopter, and fixed winged aircraft. (Defs.' Mot. at 3). Team members on a transport may consist of Transport Registered Nurses ("Transport RNs"), Transport Respiratory Therapists ("Transport RTs"), and physicians. (Defs.' Mot. at 3). Defendants Kapiolani Medical Center for Women & Children, Dew-Anne Langcaon, and Jen Chahanovich ("Defendants") maintain that Transport Teams generally consist of a Transport RN and a Transport RT and that, ultimately, the composition of a Transport Team for any particular transport is decided by a physician and the Transport Nurse. (Defs.' Mot. at 3). Defendants allege that Transport Team members undergo a rigorous selection process and training. (Defs.' Mot. at 3-4). Plaintiff contends, however, that Transport Nurses are not trained in certain procedures, which Respiratory Therapists are. (Pl.'s Statement of Facts at ¶ 9). Transport Team members are drawn from the Departments of Nursing and Respiratory Therapy at Kapiolani. (Defs.' Mot. at 3).
Plaintiff Dwayne Lopes ("Plaintiff") began his employment with Kapiolani as a part-time Respiratory Therapist. (Pl.'s Opp. at 2). In June 1992, Plaintiff became a full-time Respiratory Therapist at Kapiolani, and in 1994, he was promoted to the Critical Care Transport Team as a Respiratory Therapist. (Pl.'s Opp. at 2). As a Respiratory Therapist assigned to the Critical Care Transport Team, Plaintiff worked in tandem with Transport Nurses to transport patients to and from hospital facilities in Hawaii and the Pacific Basin. (Pl.'s Opp. at 2).
In 1997, Plaintiff became a Supervisor of the Respiratory Care Department at Kapiolani and in 1999 he was promoted to be a Manager of that department. (Pl.'s Opp. at 3). As a Respiratory Care Manager, Plaintiff oversaw the Respiratory Care Department at Kapiolani and supervised the RTs, including those RTs who were part of the Transport Team. (Defs.' Mot. at 4). As a Respiratory Care Manager, Plaintiff reported to the Director of Respiratory Care, a position that was held by David Fox ("Fox") until October 2001 and by Defendant Jen Chahanovich ("Chahanovich") from July 8, 2002 through the termination of Plaintiff's employment in August 2003. (Defs.' Mot. at 4).
The position of Director of Respiratory Care was vacant from approximately August or October[1] 2001 to July 7, 2002. (Defs.' Mot. at 4 n. 2; Pl.'s Opp. at 3). During that time, Plaintiff acted as the Interim Director of the Respiratory Care Department, while Kapiolani conducted a recruitment for the position of Permanent Director. (Defs.' Mot. at 4 n. 2; Pl.'s Opp. at 3). Plaintiff applied for the position of Permanent Director of the Respiratory Care Department. (Pl.'s Opp. at 3). At all times relevant to this litigation, Defendant Dew Anne Langcaon ("Langcaon") was employed by Kapiolani as the Chief Operating Officer. Fox and Chahanovich, while acting as the Permanent Director of the Respiratory Care Department, and *942 Plaintiff, while acting as the Interim Director, were required to report to Langcaon. (Pl.'s Opp. at 3; Defs.' Mot. at 5).
On August 5, 2001, Dr. Sherry Loo ("Dr. Loo"), a neonatologist at Kapiolani, asked Lori Fairfax ("Fairfax"), a long-time veteran of the Kapiolani Transport Team, to "head up the transport of a premature infant" from the Queen's Medical Center. (Defs.' Mot. at 5). Fairfax was unable to locate a Transport RT on the premises because the shifts were changing. (Defs.' Mot. at 5). Fairfax believed that the on-call Transport RT typically took one hour to reach the hospital. (Defs.' Mot. at 5). Defendants allege that "Fairfax paged Plaintiff, who was the Respiratory Care Manager, but Plaintiff did not return the page." (Defs.' Mot. at 5). Defendants further allege that based on these facts, Dr. Loo authorized a team of three Transport RNs (one of whom was in training) to make the transport from the Queen's Medical Center to Kapiolani. (Defs.' Mot. at 5-6). Defendants allege that the infant was transported without incident and was admitted by Kapiolani upon arrival at the hospital. (Defs.' Mot. at 6).
Plaintiff learned of the August 5th transport several days after it occurred and was concerned because the assigned Transport Team did not include a Transport RT, which Plaintiff alleges violated the protocol established by Kapiolani. (Defs.' Mot. at 6; Pl.'s Opp. at 3). Because of his concern, Plaintiff investigated the transport. (Defs.' Mot. at 6; Pl.'s Depo. at 30). From his inspection of the records of the August 5, 2001 transport, Plaintiff concluded that the breathing tube inserted into the infant was not placed properly; the wrong amount of surfactant had been administered to the infant; blood-gas readings were not performed on the infant; the transport nurses that participated in the transport were not trained to use the portable blood-gas machines; and Kapiolani personnel were available on the date of the transport who possessed the necessary training to perform the procedures the nurses had not been trained to do. (Pl.'s S. of Facts ¶¶ 40-45). Plaintiff reported his findings to Fox, who was just vacating his position as the Director of Respiratory Care. (Defs.' Mot. at 6; Pl.'s Depo. at 30). Fox discussed Plaintiff's report with Dr. Kenneth Ash ("Dr.Ash"), the Medical Director of the Transport Team. (Defs.' Mot. at 6). Dr. Ash concluded that the transport did not raise issues of concern and he so advised Fox. (Defs.' Mot. at 6). Fox reported Dr. Ash's conclusion to Plaintiff. (Defs.' Mot. at 6). Fox informed Plaintiff that based on Dr. Ash's conclusion, he did not intend to take the issue further but that Plaintiff could do so if he wished. (Defs.' Mot. at 6).
In September 2001, Plaintiff made a complaint to Kapiolani's confidential Compliance Hotline, which may be used by any employee or physician to report a potential violation of ethical or lawful business practices.[2] (Defs.' Mot. at 7; Pl.'s Opp. at 4). The toll-free number allows employees to report concerns anonymously. (Defs.' Mot. at 7). Use of the number does not allow identification of the caller's phone number and callers are not required to give their identity. (Defs.' Mot. at 6). Defendants explain that "[t]he phone message line is not traced and callers are protected from retaliation or discrimination for expressing good faith concerns." (Defs.' Mot. at 7).
In 2001, Kapiolani used an outside vendor, Compliance Concepts, to receive and *943 manage communications from callers using the Compliance Hotline. (Defs.' Mot. at 7). In September 2001, Compliance Concepts received a complaint about the August 5, 2001 transport. (Defs.' Mot. at 7). The caller complained that the transport was made without a Transport RT and was in violation of Kapiolani policy (the "Anonymous Complaint"). (Defs.' Mot. at 7). Kapiolani was not informed of the caller's identity.[3] (Defs.' Mot. at 7). Plaintiff testified that apart from the call to the Compliance Hotline, he did not report the August 5th transport to anyone outside of Kapiolani. (Defs.' Mot. at 8).
The Anonymous Complaint was investigated by the Office of Compliance at Kapiolani. (Defs.' Mot. at 8). Several Managers, including Plaintiff since he was the Respiratory Care Manager at that time, were involved in the investigation. (Defs.' Mot. at 9). The investigation included reviewing Kapiolani's policies and determining the facts surrounding the August 5th transport. (Defs.' Mot. at 9).
One issue addressed in the investigation was whether the Transport Team was appropriately composed. Plaintiff believed that a Transport RT was required to be assigned to all transports. (Defs.' Mot. at 9). At the time of the investigation, Kapiolani's "Guideline for Transport Services, Team Composition" provided that "[t]eam members may consist of Transport RNs, licensed in the State of Hawaii; Transport RTs, credentialed; Pediatric Resident, Pediatric Intensivist, Neonatal Fellow or Neonatologist." (Defs.' Ex. 13). The Guideline further provided that "[t]eam composition will be decided by the Accepting Pediatric or Neonatal physician and the Transport Nurse." (Defs.' Ex. 13). Kapiolani had also issued a "Service Goals/ Scope of Services" regarding Neonatal/Pediatric Transport Services, which stated that "[t]he Transport Team consists of Registered Nurses and Respiratory Therapists who have completed an in-depth orientation consisting of recognition and stabilization of the critically ill neonate, infant and pediatric patient." (Defs.' Ex. 14).
Defendants maintain that the "Scope of Services" was a lower-level document than the "Guideline" and that the "Guideline" afforded discretion in who was assigned to a transport and vested that "discretion in the accepting physician and the nurse." (Defs.' Mot. at 9). Plaintiff argues, however, that the "Guideline" conflicts with the "Scope of Services" and that the "Guideline" is not relevant because his complaint was that the nurses performed tasks that they were not trained to complete. (Pl.'s S. of Facts ¶ 3-5). Plaintiff further states that "[t]he composition of the team  specifically, the presence of a respiratory therapist (`RT')  is relevant only in that RTs possess the proper training to perform the actions the nurses had performed." (Pl.'s S. of Facts ¶ 3-5). Plaintiff further suggests that because of his complaint, Kapiolani has changed its Guidelines.
On December 20, 2001, a meeting was conducted among the managers who had participated in the investigation.[4] (Defs.' *944 Mot. at 10). At that meeting, three actions were decided upon to resolve the Anonymous Complaint and were documented in a "Resolution Response" dated December 27, 2001 that was forwarded to Compliance Concepts. (Defs.' Mot. at 10). The purpose of the Resolution Response was to apprise the caller of the resolution of the Anonymous Complaint. (Defs.' Mot. at 10). The Resolution Response stated that the following actions would be taken: (1) Scope of Services for Neonatal/Pediatric Transport Services will be revised to reflect Policies and Procedures for Transport Team Composition (2) All Transport Nurses will complete competencies in ventilator management and surfactant administration (3) Until competencies are met, all transports will be managed by a Transport Certified RN and a Transport Certified Respiratory Therapist. (Defs.' Mot. at 10-11). Plaintiff was upset following the December 20, 2001 meeting and complained to Langcaon about the other managers' treatment of him. (Defs.' Mot. at 11). Langcaon, who did not attend the December 20, 2001 meeting, was supportive of Plaintiff and encouraged him to let her raise the issue at a meeting that was scheduled for early January. (Defs.' Mot. at 12).
In January 2002, Plaintiff met with Ash, a nursing supervisor, and Langcaon. (Pl.'s Opp. at 4). At the meeting, Langcaon did raise the transport issue. (Defs.' Mot. at 12). Dr. Ash apologized to Plaintiff for his earlier actions and assumptions. (Defs.' Mot. at 12; Pl.'s Opp. at 4). Dr. Ash had discovered that RNs were not trained in certain aspects of transports. (Defs.' Mot. at 12; Pl.'s Opp. at 4). Defendants allege that Dr. Ash committed to creating a program for training the RNs. (Defs.' Mot. at 12). Plaintiff states that after the others left the meeting, Langcaon accused Plaintiff of causing discord within the nursing staff and of not being a "team player." (Pl.'s Opp. at 4). Plaintiff alleges that his "prior cordial relationship with Langcaon evaporated and thereafter he was subjected to a hostile work environment created by Langcaon in retaliation to his report to the Compliance Hotline. . . ." (Pl.'s Opp. at 4).
In July 2002, upon the advice of his treating physician, Plaintiff took a medical leave of absence. (Pl.'s Opp. at 6). Plaintiff states that his leave was the "result of suffering anxiety attacks and depression resulting from the verbal abuse and false accusations to which he was subjected to from Langcaon." (Pl.'s Opp. at 6). In October 2002, upon the advice of his physicians, Plaintiff took disability leave. (Pl.'s Opp. at 6). Upon filing for workers' compensation benefits, Plaintiff learned that his base pay had been reduced. (Pl.'s Opp. at 6). Defendants allege that Plaintiff's pay was reduced, upon selection of the new Director of Respiratory Care, because Plaintiff was no longer required to perform the duties that had been temporarily assigned to him while he was acting as the interim Director of the Kapiolani Respiratory Care Department. (Defs.' Reply at 12). In December 2002, while on disability leave, Plaintiff learned that the organizational structure of the Respiratory Care Department had been changed, that his assigned duties had been changed, and that Kapiolani had hired persons to perform his former duties. (Pl.'s Opp. at 6).
In January 2003, Plaintiff underwent an independent psychological evaluation performed by a clinical psychologist hired by Defendants'. (Defs.' Mot. at 13; Pl.'s Opp. at 6). The physician determined that Plaintiff was not mentally or emotionally capable of returning to his employment at Kapiolani. (Defs.' Mot. at 13; Pl.'s Opp. at 6). In March 2003, Plaintiff's treating physician also concluded that Plaintiff could not return to work at Kapiolani and Plaintiff agreed with this conclusion. *945 (Defs.' Mot. at 13). Because Plaintiff could not return to work at Kapiolani, his workers' compensation claim was referred to Vocation Rehabilitation. (Defs.' Mot. at 13). The Vocational Rehabilitation Counselor found that Plaintiff could not return to work at Kapiolani and recommended that Plaintiff attend a four-year college at Kapiolani's expense; that Kapiolani continue Plaintiff's temporary total disability payments until he received his B.A. degree; that once Plaintiff graduated from college, his temporary disability benefits would cease and he would become employed; and that once employed, Kapiolani would pay the tuition costs for a masters degree. (Defs.' Mot. at 13-14). Plaintiff is currently receiving these benefits pursuant to the Vocational Rehabilitation Counselor's recommendations. (Defs.' Mot. at 14).
On July 13, 2003, Plaintiff returned to his office at Kapiolani. (Defs.' Mot. at 14: Pl.'s Decl. ¶ 214). Defendants state that "Plaintiff had not been at the office for almost one year, and he did not have management authorization to return while on workers compensation leave." (Defs.' Mot. at 14). Plaintiff states, however, that he had attempted to make an appointment with Ramona Clemente to discuss his "personal and intellectual property." (Pl.'s Decl. ¶¶ 211-12). However, he did not hear back from her. (Pl.'s Decl. ¶¶ 211-12). Plaintiff further states that when he went to the office, he met with Wendell Inouye, a newly appointed supervisor, and asked for a few boxes so that Plaintiff could take his things home. (Pl.'s Decl. ¶¶ 214-16). Plaintiff states that Inouye assisted him and remained with him while he filled the boxes. (Pl.'s Decl. ¶¶ 216-19).
Defendants state that Plaintiff removed five boxes of materials from the workplace without authorization. (Defs.' Mot. at 14). Defendants further explain that upon learning of Plaintiff's visit and his removal of the five boxes of materials, Kapiolani contacted Plaintiff and asked him to return the materials. (Defs.' Mot. at 15). However, Plaintiff contended that the removed items belonged to him and that some of his belongings were missing from his office. (Defs.' Mot. at 15). Kapiolani requested that Plaintiff return the items to enable Kapiolani to verify that all the removed items belonged to Plaintiff. (Defs.' Mot. at 15). Upon the advise of his former attorney, Plaintiff agreed to a meeting to discuss the contents of the boxes. (Defs.' Mot. at 15; Pl.'s Decl. ¶ 227). Defendants state that thereafter Plaintiff unilaterally cancelled the scheduled meeting and failed to return messages that were left for him on July 25 and August 5. (Defs.' Mot. at 15). On August 20, 2003, Kapiolani sent Plaintiff a letter instructing him to return the files and documents that he had removed and warning him that failure to do so could result in his termination. (Defs.' Mot. at 15). Plaintiff states that he contacted his former attorney regarding the letter and the attorney advised him to seek another attorney. (Pl.'s Decl. ¶ 228). Plaintiff did not respond to the letter and on August 28, 2003 he was terminated from his employment with Kapiolani for theft. (Defs.' Mot. at 15).
II. Procedural History
On December 3, 2003, Plaintiff filed a Complaint.
On January 12, 2004, Defendants Kapiolani Medical Center for Women & Children, Dew-Anne Langcaon, and Jen Chahanovich filed an Answer to Plaintiff's Complaint.
On April 27, 2005, Defendants Kapiolani Medical Center for Women & Children, Dew-Anne Langcaon, and Jen Chahanovich filed a Motion for Summary Judgment.
*946 On May 5, 2005, Plaintiff filed a Motion to Extend Time to File Opposition to Defendants' Motion for Summary Judgment and an Ex Parte Motion to Shorten Time to Hear Motion to Extend Time to File Opposition to Defendants' Motion for Summary Judgment, and this Court Granted Plaintiff's Ex Parte Motion.
On May 6, 2005, Defendants Kapiolani Medical Center for Women & Children, Dew-Anne Langcaon, and Jen Chahanovich filed an Opposition to Plaintiff's Motion to Extend Time to File Opposition.
On May 9, 2005, a hearing was held on Plaintiff's Motion to Extend Time to File Opposition to Defendants' Motion for Summary Judgment, and the Court Granted Plaintiff's Motion.
On May 16, 2005, the Court filed an Order Granting Plaintiff's Motion to Extend Time to File Opposition to Defendants' Motion for Summary Judgment.
On July 1, 2005, Plaintiff filed an Opposition to Defendants' Motion for Summary Judgment.
On July 8, 2005, Defendants Kapiolani Medical Center for Women & Children, Dew-Anne Langcaon, and Jen Chahanovich filed a Reply.
On July 21, 2005, a hearing was held on Defendants' Motion for Summary Judgment.
On July 22, 2005, Plaintiff filed a Submission of the Transcript of the Deposition of Ramona Clemente Taken July 12, 2005 and Exhibits 1 to 17 to that Deposition.
On July 25, 2005, Defendants Kapiolani Medical Center for Women & Children, Dew-Anne Langcaon, and Jen Chahanovich filed a Reply to Plaintiff's Submission of the Transcript of the Deposition of Ramona Clemente.

STANDARD
The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[5] Fed. R.Civ.P. 56(c).
"A fact is `material' when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if `the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[6]Thrifty Oil Co. v. Bank of America Nat'l Trust & Sav. Ass'n, 310 F.3d 1188, 1194 (9th Cir.2002) (quoting Union School Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994)) (internal citations omitted). Conversely, where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).
*947 The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may do so with affirmative evidence or by "`showing'  that is pointing out to the district court  that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325, 106 S.Ct. 2548. All evidence and reasonable inferences drawn therefrom are considered in the light most favorable to the nonmoving party. See, e.g., T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir.1987). The Court's role is not to make credibility assessments. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. Id. at 250-51, 106 S.Ct. 2505. Once the moving party satisfies its burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. See Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548; Matsushita Elec., 475 U.S. at 586, 106 S.Ct. 1348; California Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir.1987). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir.2002); see also T.W. Elec. Serv., 809 F.2d at 630. The nonmoving party must instead set forth "significant probative evidence tending to support the complaint." T.W. Elec. Serv., 809 F.2d at 630. Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial. See Celotex, 477 U.S. at 322, 106 S.Ct. 2548.

DISCUSSION
I. Retaliation in Violation of the EMTALA and the HWPA
The parties agree that the framework adopted by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for the analysis of retaliation claims under Title VII should be applied here. Under the McDonnell Douglas framework, Plaintiff has the initial burden of establishing a prima facie case. See Manatt v. Bank of America, NA, 339 F.3d 792, 800 (9th Cir.2003). To make out a prima facie case of retaliation, a plaintiff must establish: (1) he engaged in protected activity, (2) his employer subjected him to an adverse employment action, and (3) a causal link between the protected activity and the adverse action. Id. If the plaintiff asserts a prima facie retaliation claim, the burden shifts to the defendant to articulate a "legitimate, non-discriminatory reason for the adverse employment action." Id. Finally, if the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely pretext for a discriminatory motive. Id.
A) Protected Activity Under the Emergency Medical Treatment and Active Labor Act
In his Complaint, Plaintiff claims that "[t]he actions of Defendants Langcaon and Chahanovich violated Plaintiff's right to be free from retaliation in reporting a violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, et seq." (Compl. ¶ 25). However, Defendants argue that Plaintiff's claim fails because the Emergency Medical Treatment and Active Labor Act simply does not apply in this case. (Defs.' Mot. at 17).
Congress enacted the Emergency Medical Treatment and Active Labor Act of *948 1986 ["EMTALA"], commonly known as the Patient Anti-Dumping Act, 42 U.S.C. § 1395dd, to ensure that individuals, regardless of their ability to pay, receive adequate emergency medical care. Bryant v. Adventist Health System/West, 289 F.3d 1162, 1165 (9th Cir.2002) (citing Jackson v. E. Bay Hosp., 246 F.3d 1248, 1254 (9th Cir.2001)). "`Congress was concerned that hospitals were "dumping" patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized.'" Id. (quoting Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1255 (9th Cir.1995)). The EMTALA protects all patients, not just those with insufficient resources. Arrington v. Wong, 237 F.3d 1066, 1070 (9th Cir.2001) (citations omitted). "EMTALA, however, was not enacted to establish a federal medical malpractice cause of action nor to establish a national standard of care." Bryant, 289 F.3d at 1166 (citing Baker v. Adventist Health, Inc., 260 F.3d 987, 993 (9th Cir.2001)); Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1255 (9th Cir.1995) (citing H.R.Rep. No. 241, 99th Cong., 1st Sess. (1986)) ("Consistent with the statutory language, the legislative history shows that Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay.").
The EMTALA prohibits participating hospitals from taking adverse action "against any hospital employee because the employee reports a violation" of the EMTALA. 42 U.S.C. § 1395dd(i). Here Plaintiff claims that Defendants retaliated against him for reporting Kapiolani's alleged violation of the EMTALA's requirements for an "Appropriate Transfer" under 42 U.S.C. § 1395dd(c)(2). (Pl.'s Opp. 9-11). However, the transfer requirements established by 42 U.S.C. § 1395dd(c)(2) must be triggered. See James v. Sunrise Hospital, 86 F.3d 885, 889 (9th Cir.1996) (holding that the transfer restrictions of 42 U.S.C. § 1395dd(c) "apply only when an individual `comes to the emergency room,' and after `an appropriate medical screening examination,' `the hospital determines that the individual has an emergency medical condition.'").
For the EMTALA's transfer provisions to apply, an individual must "come[] to the emergency department" and a request must be made on the individual's behalf for examination or treatment. 42 U.S.C. § 1395dd(a). The hospital is then required to "provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). If the hospital determines that the individual has an emergency medical condition, the hospital must either stabilize the medical condition or transfer the individual to another medical facility in accordance with the EMTALA's transfer provisions. 42 U.S.C. § 1395dd(b)(1). Thus, if the hospital does not stabilize the emergency medical condition and the hospital transfers the patient, the hospital must then comply with the transfer restrictions of 42 U.S.C. § 1395dd(c)(2). 42 U.S.C. § 1395dd(b)(1); 42 U.S.C. § 1395dd(c)(1). However, the EMTALA's requirements end once a patient is admitted to the hospital. Bryant v. Adventist Health System/West, 289 F.3d 1162, 1168-69 (9th Cir.2002) (internal citations omitted) (holding that "EMTALA's stabilization requirements ends when an individual is admitted for inpatient care. Congress enacted EMTALA `to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat' and not to `duplicate preexisting legal protections.'").
Here questions of material fact exist as to whether the EMTALA's transfer restrictions applied to the August 2001 *949 subject transfer. Plaintiff states that the patient was delivered in "the Queen's [Medical Center] Operating Room" by a "crash (emergency) Cesarian section due to the mother's critical medical condition." (Pl.'s Decl. ¶ 19); see also (Defs.' Ex. 1 at 25:21-24) (stating that a "Crash C-section was done because mom's vital signs and the like were essentially life-threatening"). However, the Court finds that questions of material fact exist as to the circumstances under which the "emergency" Cesarian section took place. Although the record shows that the mother had an emergency medical condition, it is not clear from the record whether the infant's mother "came to"[7] the Queen's Medical Center under emergency conditions nor whether the mother and/or the infant were admitted[8] to the Queen's Medical Center prior to the subject transport.
When the evidence is viewed, as it must be, in the light most favorable to Plaintiff, questions of material fact also exist as to whether the infant was "stabilized" prior to the transfer. Under the EMTALA, the term "stabilized" means that "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual. . . ." 42 U.S.C. § 1395dd(e)(3)(B). Here the record reveals that after delivery, the baby required stimulation. (Defs.' Ex. 1 at 25:25). The record also indicates that the Queen's Medical Center anesthesiologist noted that due to the mother's critical condition, he could not stay at the baby's bedside to oversee the infant's care. (Pl.'s Decl. ¶ 20). Although the patient's records indicate that he was intubated, the chart notes also showed that initially the tube had been pushed too far down into the lung which made it difficult for the patient to breath and later required correction. (Pl.'s Decl. ¶¶ 20-21). The record also shows that blood gases may not have been drawn or analyzed[9], which was an established practice, and that the wrong amount of surfactant had been administered to the patient. (Pl.'s Decl. ¶¶ 21-22). Finally, the record shows that the infant's "[b]lood pressure measurements were borderline critical throughout the transport" and that *950 "[b]lood pressure is a primary indicator of the patient's overall condition."[10] (Pl.'s Decl. ¶ 22). The Court finds questions of material fact exist as to whether the infant was stabilized prior to transport by Kapiolani.
Finally, questions of material fact exist as to whether the subject transfer met the EMTALA's requirements for an "appropriate transfer." 42 U.S.C. § 1395dd(c)(2). Among other requirements, the EMTALA requires that a transfer be "effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer." 42 U.S.C. § 1395dd(c)(2)(D) (emphasis added); see also Burditt v. U.S. Dept. of Health and Human Services, 934 F.2d 1362 (5th Cir.1991) ("Because Congress obviously was aware of the option of requiring only relatively qualified personnel and transportation equipment, we understand 42 U.S.C. § 1395dd(c)(2)(C) to require personnel and transportation equipment that a reasonable physician would consider appropriate to safely transport the patient in question.").
Here the evidence before the Court indicates that although a Respiratory Therapist is normally a part of each Transfer Team, the subject transfer was effected by a team of three Transport RNs, one of whom was in training, and no Respiratory Therapist. (Defs.' Mot. at 5-6; Defs.' Ex. B at 34:16-21). The record indicates that during the ten-minute transport "a baby could have a decrease in their heart rate, in their blood pressure, [and] in their oxygen level" and that if this was not addressed, the child would deteriorate and could sustain brain damage. (Defs.' Ex. B at 43:4-13). The record also shows that here the nurses were not trained to deliver surfactant therapy (which they administered to the infant) and were also not trained to utilize the portable blood gas machine that is used for monitoring oxygen and carbon dioxide and breathing during the transport. (Defs.' Ex. B at 17-18:24 and 25:4-12); see also (Defs.' Mot. at 12; Pl.'s Opp. at 4) (indicating that Dr. Ash, the Transport Team Medical Director, discovered after the investigation surrounding Plaintiff's complaints that RN's were not trained in certain aspects of transports and that he was committed to putting together a program for training). On the other hand, the Transport Team that conducted the subject transport was authorized by Dr. Loo and the infant was transported apparently without lasting harm. (Fairfax Decl. at ¶ 4). While Kapiolani and the Queen's Medical Center have clearly satisfied EMTALA's goal of not turning away a patient in need, nevertheless there is a question of fact whether EMTALA's appropriate transfer requirement *951 was met because questions of material fact exist as to whether it was effected by qualified personnel.
Although material questions of fact exist as to whether the EMTALA applied to the subject transfer, Defendants Dew-Anne Langcaon and Jen Chahanovich are entitled to Summary Judgment as to Plaintiff's EMTALA claim because as the United States Court of Appeals for the Ninth Circuit has held, "[t]he plain text of the EMTALA explicitly limits a private right of action to [one against] the participating hospital."[11]Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1256 (9th Cir. 1995) (referring to 42 U.S.C. § 1395dd(d)(2), which provides, "Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.") (emphasis added); see also Jackson v. East Bay Hosp., 246 F.3d 1248, 1260 (9th Cir.2001) (holding that a company providing administrative, purchasing, and financial services to a hospital was not a "hospital" and thus could not be held directly liable under EMTALA).[12]
The Court finds that questions of material fact exist which govern the applicability of EMTALA's transfer restrictions to the August 2001 subject transfer (including whether the mother came to the hospital in an emergency condition, whether the mother and/or the infant were admitted to the Queen's Medical Center prior to the transport, whether the infant was stabilized prior to the transport, and whether the transfer constituted an appropriate transfer), and thus whether Plaintiff engaged in protected activity under EMTALA.[13]
*952 B) Protected Activity Under the Hawaii Whistleblowers' Protection Act
The Hawaii Whistleblowers' Protection Act (HWPA) provides, in pertinent part:
An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because: (1) The employee, or person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of: (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, or the United States. . . .
Haw.Rev.Stat. § 378-62. The HWPA was amended, effective April 26, 2002, to expand the activities protected, under the Act, from reports made to public bodies[14] to also include reports made to employers. 2002 Haw. Sess. Laws, Act 56, § 5. However, the Amendment provides, "This Act does not affect rights and duties that matured, penalties that were incurred, and proceedings that were begun, before its effective date." 2002 Haw. Sess. Laws, Act 56, § 5. The Hawaii courts have not addressed when the rights and duties provided for in the HWPA "mature" such that the amended version does not apply. 2002 Haw. Sess. Laws, Act 56, § 5.
The Court finds instructive the fact that the applicable statute of limitations runs from the date of the "occurrence of the alleged violation" and not from the date of the alleged protected activity. Haw.Rev.Stat. § 378-63(a) ("A person who alleges a violation of this part [Whistleblowers' Protection Act] may bring a civil action for appropriate injunctive relief, or actual damages, or both within two years after the occurrence of the alleged violation of this part.").[15] Here the occurrence of the alleged violations took place at the time of the alleged retaliatory acts. The Court finds that Plaintiff's rights under the statute did not mature until the alleged acts of retaliation occurred and will accordingly apply the amended version of the statute, covering complaints made to an employer, to those acts of alleged retaliation, which occurred after April 26, 2002. Plaintiff made a report to his employer regarding a violation or suspected violation of EMTALA and therefore engaged in protected activity under the HWPA.
*953 C) Adverse Actions and Causation
Assuming that Plaintiff engaged in protected activity under the EMTALA and the HWPA, he must still show that a causal link exists between the protected activity and the adverse action. See Crosby v. State Dep't of Budget & Fin., 76 Hawai`i 332, 876 P.2d 1300, 1310 (1994) ("In other words, a causal connection between the alleged retaliation and the `whistleblowing' is required."); McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1124 (9th Cir.2004) (explaining that under the McDonnell Douglas framework, as applied to a Title VII claim of retaliation, the plaintiff must show that a causal link exists between the protected activity and an adverse employment action that was thereafter taken against him).
Plaintiff alleges that "[a]fter he made the hotline complaint and after the concerns that Plaintiff raised proved valid, Plaintiff's career came to an abrupt halt."[16] (Pl.'s Opp. at 27). Plaintiff alleges that his relationship with Langcaon deteriorated and that she canceled all meetings with him. (Pl.'s Decl. ¶ 89). This was significant to Plaintiff because he was dealing with a number of outstanding issues, as a result of his position as the interim director. (Pl.'s Decl. ¶ 89). In particular, Plaintiff alleges that he was overseeing *954 problems with Kapiolani's use of the Nova Blood Gas System. (Pl.'s Decl. ¶ 109).
Plaintiff alleges that he had interviewed and visited with providers of many different systems and eventually negotiated with Bayer Blood Gas System "to have three of their blood gas analyzers and their data storage system installed on a trial basis . . ." (Pl.'s Decl. ¶ 112). Plaintiff alleges that "[b]y early May 2002, the Nova blood gas machines had become so problematic that physicians and staff alike were frequently questioning the results and safety of the system. Many of the physicians were ordering . . . additional blood samples from the same patient to compare to the original results." (Pl.'s Decl. ¶ 116). Plaintiff further alleges that "[t]he Bayer Blood Gas System, however, was performing nearly flawlessly" and "the only draw back to having the Bayer system on a trial basis, was that we did not own the machines and as such were unable to charge the patients for their blood gas results that were analyzed on this system. This resulted in losses of revenue in the thousands of dollars per day and that figure grew to tens of thousands when, at the behest of the Nova Clinical support, the Nova systems were shut down completely in mid-May 2002." (Pl.'s Decl. ¶¶ 115-16).
Plaintiff alleges that to remedy this situation, he explored options with the Bayer Company. (Pl.'s Decl. ¶¶ 117). Plaintiff states that the Company offered a lease-to-own program and that he worked with his department business partner, Sue Sugai, to secure necessary signatures, including Langcaon's, to accept the contract. (Pl.'s Decl. ¶ 117). Plaintiff alleges that "[h]aving this contract in place allowed us legally to continue charging for the blood gas results and our revenues remained unaffected." (Pl.'s Decl. ¶ 117).
Plaintiff alleges that "[b]y the end of May and during most of June 2002, [he] was unable to secure any meetings with [Langcaon] and all communication with her had become nonexistant" and that he "still continued to leave quotes of purchases, notes of outstanding issues, physician concerns, etc., with her administrative assistant . . . but [he] still received no responses." (Pl.'s Decl. ¶ 118). Plaintiff further explains that "[w]ith [Langcaon] not responding to [him], [he] sought guidance for creating contracts and formalizing equipment requisitions" from various other individuals, which "proved frustrating because no one knew the entire process, only parts or pieces." (Pl.'s Decl. ¶ 119). Plaintiff alleges that the "week of May 20, 2002, he forwarded a cost justification with a detailed explanation why the purchase of a new blood gas system was inevitable and a purchase contract for the Bayer Blood Gas System to [Langcaon] for her review." (Pl.'s Decl. ¶ 120). Plaintiff alleges that he continued to try to obtain a response from Langcaon, but he still did not receive a response so he obtained assistance from the Legal Department and made contact with representatives of Bayer. (Pl.'s Decl. ¶ 122-24).
On June 25, 2002, Plaintiff states that he paged Langcaon twice and that "around 3:00 p.m. [Langcaon] entered [his] department notably out of breath, and asked what the emergency was. [He] took this opportunity to verbally explain the situation: The ending of the Bayer Blood Gas System trial period, the contracts and statements in her possession and the true urgency to finalize this purchase." (Pl.'s Decl. ¶ 125-26). Plaintiff alleges that Langcaon never responded to him. (Pl.'s Decl. ¶ 127).
Plaintiff states that finally on June 27, 2002, Langcaon's assistant squeezed him in for a mid-morning meeting. (Pl.'s Decl. ¶ 129). Plaintiff claims that Langcaon "was visibly upset when [he] arrived for [his] meeting. She told [him] to sit at her *955 conference table and with her office door wide open, began to lecture [him]. She scolded [him] on [his] inability to effectively handle this type of situations [sic], and [his] inability to negotiate contracts." (Pl.'s Decl. ¶ 130). Plaintiff states that when he left Langcaon's office, he "immediately noted that all of the administrative assistants stationed in the reception area were looking in and had obviously heard [the] entire meeting." (Pl.'s Decl. ¶ 138). Plaintiff explains that Langcaon eventually signed the contracts, but later "talked to a worker's compensation investigator about [his] handling of the blood-gas machines. She stated that [he] had resolved the blood gas contracts inappropriately and not in accordance with company policy and that consequently, when the contracts came in for her to sign at the eleventh hour, she did not sign." (Pl.'s Decl. ¶ 141-42).
Plaintiff further claims that in late July 2002, he called in sick but received a call at home from Jenny Chahanovich's ("Chahanovich"), the new Director of Respiratory Care, secretary Karen Harada ("Harada"). (Pl.'s Decl. ¶ 172). Harada indicated that it was urgent that he call Chahanovich about a Nova company conference call. (Pl.'s Decl. ¶ 172). Plaintiff states that he phoned Chahanovich and that she explained that Langcaon had set up a telephone conference in her office for the next day and Chahanovich could not emphasize how vitally important it was for him to attend. (Pl.'s Decl. ¶ 172). Plaintiff attended the meeting and claims that at the meeting, Langcaon explained that Plaintiff would be taking the lead role in the conference and the goal was to have the Nova company end the contract with minimum financial impact to Kapiolani. (Pl.'s Decl. ¶ 174).
Plaintiff states that "[t]he meeting went well" but that "[i]n the end, the vice president of Nova agreed to further discuss settling the contract for a reduced amount [and Langcaon then] directed the Nova vice president to discuss all aspects of this issue with Jenny Chahanovich instead of [him]." (Pl.'s Decl. ¶¶ 174-75). Plaintiff states that after the conference, Langcaon expressed how happy she was with the outcome and then directed Chahanovich to get all the information that Plaintiff had and to bring the Nova issue to a close. (Pl.'s Decl. ¶ 176). Plaintiff claims that Langcaon also directed Chahanovich to bring closure to the final steps of a very large nursing glucometer project that Plaintiff had been working on and to get all the information from Plaintiff. (Pl.'s Decl. ¶ 179). Plaintiff explains that "[t]he problem [he] had with this sudden change is that [his] current yearly evaluation was due and not being permitted to complete those projects would affect the rating of [his] evaluation and the subsequent pay increase. [He] was also very upset that [he] had spent a considerable amount of time in creating the projects and now, as they neared completion they were being removed from [him]." (Pl.'s Decl. ¶ 180).[17]
*956 The United States Court of Appeals has held that "in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir.2002) (citing Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 507 (9th Cir.2000) (noting that causation can be inferred from timing alone); Miller v. Fairchild Indus., 885 F.2d 498, 505 (9th Cir.1989) (prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.1987) (sufficient evidence existed where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after the investigation ended)).
Here Plaintiff alleges that his relationship with Langcaon began to deteriorate in January 2002 and resulted in the adverse acts, of May to July 2002, described above. During that time, the investigation surrounding Plaintiff's complaint regarding the subject transfer was ongoing. In her deposition, Judy Fadrowsky ("Fadrowsky"), the Compliance Officer at Kapiolani, explained that she signed the Issue Closing Memorandum regarding Plaintiff's compliance complaint on May 12, 2003 and that the Compliance Committee, of which Langcaon was a member, approved the Memorandum on June 5, 2003. (Pl.'s Opp. at 24; Pl.'s Ex. A at 70:22-74:22; Ex. F). The Court finds the fact that the adverse actions described above occurred during the ongoing resolution of Plaintiff's complaint sufficient to infer a causal connection between the two activities. Although Defendants point to alleged acts of positive treatment[18] of Plaintiff by Langcaon, which occurred during January to July 2002, these do not overcome, for summary judgment analysis, the causal inference suggested by the timing of the adverse events.[19]
As discussed above, the Court finds that questions of material fact exist as to Plaintiff's claims under the EMTALA and the HWPA and accordingly DENIES Defendant Kapiolani Medical Center for Women & Children's Motion for Summary Judgment as to Plaintiff's claim of retaliation in violation of the EMTALA (Plaintiff's First Claim for Relief) and Defendants Kapiolani Medical Center for Women & Children, Dew-Anne Langcaon, and Jen Chahanovich's Motion for Summary Judgment as to Plaintiff's claim of retaliation in violation of the HWPA (Plaintiff's Second Claim for Relief). However, the Court GRANTS *957 Defendants Dew-Anne Langcaon and Jen Chahanovich's Motion for Summary Judgment as to Plaintiff's EMTALA claim because EMTALA explicitly limits a private right of action to the participating hospital.
II. Intentional Infliction of Emotional Distress
To establish a claim for intentional infliction of emotional distress the plaintiff must show "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another." Hac v. University of Hawaii, 102 Hawai`i 92, 73 P.3d 46, 60-61 (2003). Moreover, in defining "outrageous," Hawaii courts follow the Restatement (Second) of Torts. Id.; Nagata v. Quest Diagnostics Inc., 303 F.Supp.2d 1121, 1127 (D.Haw.2004) (citations omitted). The Restatement provides:
It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
Restatement (Second) of Torts § 46, cmt. d. (1965). "The question whether the actions of the alleged tortfeasor are . . . outrageous is for the court in the first instance, although where reasonable persons may differ on that question it should be left to the jury." Nagata, 303 F.Supp.2d at 1127 (citing Shoppe v. Gucci America, Inc., 94 Hawai`i 368, 14 P.3d 1049, 1068 (2000)).
While it is true that in Hawaii courts have been reluctant to find conduct to be outrageous; this Court has found that sexually harassing behavior, racial slurs, and accusations of criminal conduct can all possibly be considered outrageous conduct. Id. (citing Lapinad v. Pacific Oldsmobile-GMC, 679 F.Supp. 991, 996 (D.Haw.1988)). This Court has also found that outrageous behavior may be found where a plaintiff claims that her supervisor used her work injury as a pretext for wrongfully discharging her in retaliation and in response to a personal dislike for her. Kalawe v. KFC Nat'l Mgmt. Co., 1991 WL 338566 (D.Haw.1991). Here, as discussed above, questions of material fact exist as to whether, among other acts of alleged retaliation[20], Langcaon's adverse treatment of Plaintiff (including her refusal to respond to Plaintiff's inquiries, her public scolding of Plaintiff, and her reassignment of projects in such a manner as to impact his pay and employment evaluation) was in retaliation for his protected activity. Such conduct, when viewed in the light most favorable to Plaintiff, may be found to constitute outrageous behavior. The Court accordingly DENIES Defendants' Motion for Summary Judgment as *958 to Plaintiff's claim of Intentional Infliction of Emotional Distress (Plaintiff's Third Claim for Relief).

Conclusion
First, for the reasons above, the Court DENIES Defendant Kapiolani Medical Center for Women & Children's Motion for Summary Judgment as to Plaintiff's claim of retaliation in violation of the EMTALA (Plaintiff's First Claim for Relief). Second, the Court GRANTS Defendants Dew-Anne Langcaon and Jen Chahanovich's Motion for Summary Judgment as to Plaintiff's EMTALA claim (Plaintiff's First Claim for Relief) because EMTALA explicitly limits a private right of action to the participating hospital. Third, the Court DENIES Defendants Kapiolani Medical Center for Women & Children, Dew-Anne Langcaon, and Jen Chahanovich's Motion for Summary Judgment as to Plaintiff's claim of retaliation in violation of the HWPA (Plaintiff's Second Claim for Relief). Finally, the Court DENIES Defendants Kapiolani Medical Center for Women & Children, Dew-Anne Langcaon, and Jen Chahanovich's Motion for Summary Judgment as to Plaintiff's claim of Intentional Infliction of Emotional Distress (Plaintiff's Third Claim for Relief).
IT IS SO ORDERED.
NOTES
[1] The Court notes that Defendants state that the position was vacant from "approximately October 2001." (Defs.' Mot. at 4 n. 2). However, Defendants also state that Plaintiff began to assume the Director duties in approximately September 2001. (Defs.' Mot. at 11). Plaintiff alleges that he acted as the Interim Director of the Respiratory Care Department beginning in August 2001. (Pl.'s Opp. at 3).
[2] Plaintiff alleges that the Compliance Hotline was established by Kapiolani and the federal government as part of a settlement arising out of previous violations of federal law and regulations by Kapiolani. (Pl.'s Opp. at 4).
[3] Plaintiff states that "[a]lthough [he] was given the option to remain anonymous, he was informed that if the issue he raised were serious enough, he would have to provide his name." (Pl.'s S. of Facts ¶ 16). Plaintiff decided to provide his name from the first phone call. (Pl.'s S. of Facts ¶ 16). Plaintiff, however, does not contend that Compliance Concepts disclosed his identity to Kapiolani. (Pl.'s S. of Facts ¶¶ 17-19).
[4] Plaintiff states that approximately eight weeks after he made his report to the Compliance Hotline, Plaintiff was called into a meeting with Kenneth Ash, M.D., the Medical Director of the Critical Care Transport Team, the Kapiolani Nursing Director, and the former Respiratory Care Director. (Pl.'s Opp. at 4). Plaintiff claims that he was told to "`drop this shit' and that nothing was wrong with the August 5, 2001 transport." (Pl.'s Opp. at 4).
[5] Affidavits made on personal knowledge and setting forth facts as would be admissible at trial are evidence. Fed.R.Civ.P. 56(e). Legal memoranda and oral argument are not evidence and do not create issues of fact. See British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir.1978).
[6] Disputes as to immaterial issues of fact do "not preclude summary judgment." Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1478 (9th Cir.1986).
[7] The United States Court of Appeals for the Ninth Circuit has held that "EMTALA's transfer provision, which generally prohibits transfer of a patient with an emergency medical condition that has not been stabilized, 42 U.S.C. § 1395dd(c), applies only to individuals who `come [] to the emergency room,' not to individuals who are directly admitted to the hospital." Bryant v. Adventist Health System/West, 289 F.3d 1162, 1169 (9th Cir.2002) (citing James, 86 F.3d at 889). However, the United States Court of Appeals for the Ninth Circuit applies the Department of Health and Human Services' broad interpretation of the EMTALA's use of the phrase "comes to the emergency department." Arrington v. Wong, 237 F.3d 1066, 1074 (9th Cir.2001). "The Department interprets that statutory phrase broadly, to include not just the emergency room itself, but all hospital property  side-walks, outlying facilities, and ambulances  so that once a patient seeking medical treatment presents himself at any facility or vehicle owned or operated by the hospital, he has `come to' the emergency department." Id. at 1072 (citing 42 C.F.R. § 489.24).
[8] The Ninth Circuit has explained that "[a]fter an individual is admitted for inpatient care, state tort law provides a remedy for negligent care. If EMTALA liability extended to inpatient care, EMTALA would be `convert[ed] into a federal malpractice statute, something it was never intended to be.'" Bryant v. Adventist Health System/West, 289 F.3d 1162, 1169 (9th Cir.2002) (internal citations omitted).
[9] In his declaration, Plaintiff alleges that the patient's chart notes showed that no blood gases were drawn or analyzed (Pl.'s Decl. ¶¶ 21-22). However, Lori L. Fairfax, the Kapiolani Transport Team RN who was asked by Dr. Loo to head the subject transport, stated in her deposition that during their assessment of the baby, the Kapiolani team did x-rays and blood gasses. (Defs.' Ex. B at 49:13-14).
[10] If an individual is not stabilized, the EMTALA prohibits transfer of the individual unless:

(A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligation under this section and of the risk of transfer, in writing requests transfer to another medical facility, (ii) a physician . . . has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or (iii) if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person . . . has signed a certification . . . after a physician . . ., in consultation with the person, has made the determination . . . and subsequently countersigns the certification; and (B) the transfer is an appropriate transfer. . . .
42 U.S.C. § 1395dd(c)(1). Here there is no evidence of a written transfer request nor of a certification as described in 42 U.S.C. § 1395dd(c)(1)(A)(ii)-(iii).
[11] Plaintiff cites extensively from Fotia v. Palmetto Behavioral Health, 317 F.Supp.2d 638 (D.S.C.2004), apparently for the proposition that the EMTALA creates a private cause of action against hospital administrators. However, the South Carolina District Court in Fotia did not find that the EMTALA creates a private right of action against private individuals rather it simply found that the EMTALA provides whistleblowers with a private right of action against hospitals for retaliation. Id. at 643.
[12] The term "participating hospital" means a hospital that has entered into a Medicare provider agreement. 42 U.S.C. § 1395dd(e)(2); Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1256 (9th Cir.1995).
[13] Defendants argue that even if the EMTALA applied to the subject transfer, Kapiolani, as the recipient hospital, was simply required to "not refuse to accept from a referring hospital . . . an appropriate transfer of an individual who requires such specialized capabilities or facilities if the receiving hospital has the capacity to treat the individual." 42 C.F.R. § 489.24(f) (emphasis added). However, the statute is not clear as to which hospital, or whether both, is responsible for accomplishing an appropriate transfer in a case such as this, where the receiving hospital effects the transfer from the transferring hospital. Here, the evidence shows that the Kapiolani Transport Team arrived at the Queen's Medical Center prior to the delivery of the infant and cared for the infant prior to the transfer. (Defs.' Ex. B at 47-49). Moreover, the evidence before the Court shows that Kapiolani "has a contract with Queens and other hospitals to take over the care of patients who require a higher level of intensive care than the original hospital can provide." (Pl.'s Decl. ¶ 6). Questions of material fact exist as to the terms of the contract and whether it provides for the distribution of liability for the transport of neonatal patients.

The Court also notes that the EMTALA's whistleblower provision, 42 U.S.C. § 1395dd(i), simply states that "[a] participating hospital may not penalize or take adverse action against . . . any hospital employee because the employee reports a violation of a requirement of [the EMTALA]." 42 U.S.C. § 1395dd(i) (emphasis added). The whistleblower provision does not specify that the "violation" must be on the part of the penalizing hospital. Thus, even if the alleged violation of the EMTALA's transfer provisions is attributable to the Queen's Medical Center, Plaintiff may still establish Kapiolani's liability under the EMTALA's whistleblower provision.
[14] Plaintiff has alleged that the Confidential Compliance Hotline, to which he made the report, was established by Kapiolani and the federal government as part of a settlement arising out of previous violations of federal law and regulations by Kapiolani. (Pl.s' Opp. at 4). Moreover, Kapiolani's Compliance Manager, Judy Fadrowsky ("Fadrowsky") testified that Kapiolani is required to make closure reports regarding each compliance report and that an annual report is made each year to the "federal agency" that includes every hotline call and a synopsis of the resolution. (Pl.'s Ex. A at 63-64). Further, Fadrosky testified that the federal agency may visit Kapiolani at any time and are entitled to access to the compliance logs. Id. However, the Supreme Court of Hawaii has held that HWPA's definition of "public body" does not include federal agencies. McCormick v. Keohokalole, 53 P.3d 820, 820 n. 1, 2002 WL 1965563 (Haw.2002).
[15] Similarly, the EMTALA establishes a two year statute of limitations, from the date of the alleged violation, for actions brought under the act. 42 U.S.C. § 1395dd(d)(2)(C) ("No action may be brought . . . more than two years after the date of the violation with respect to which the action is brought."). Plaintiff filed this suit on December 3, 2003.
[16] The first adverse action alleged by Plaintiff (which falls within the two-year limitations period applicable to claims under EMTALA) to have been taken in response to his complaint regarding the subject transfer is that on or about the second week of December of 2001 Langcaon told Plaintiff that he was not selected for the permanent position of Director of Respiratory Care. (Opp. at 26; Pl.'s Decl. ¶ 57). Langcaon informed Plaintiff that he was not selected for the permanent Director position in December of 2001. At that time, the investigation surrounding Plaintiff's complaint regarding the subject transfer was ongoing. Moreover, Langcaon has stated that she took into account Plaintiff's behavior in the meetings related to the resolution of his compliance complaint in making the decision that Plaintiff would not be selected for the Director's position. (Pl.'s Ex. D at 142:14-23). The Court finds the fact that the selection decision was made during the ongoing investigation of Plaintiff's complaint sufficient to infer a causal connection between the two activities.

Defendants argue that even if Plaintiff can establish a prima facie case of causation, that they have presented legitimate reasons for not selecting Plaintiff as the permanent Director and that Plaintiff cannot establish that the reasons advanced by Kapiolani are pretextual. Defendants explain that in the fall of 2001, Kapiolani retained a recruiter to solicit applications and created a selection committee to review the applicants. (Defs.' Reply at 11). Plaintiff was one of several candidates who was considered for the position by the selection committee. (Defs.' Reply at 11). Ultimately, the selection committee determined that they did not have a candidate who was qualified for the position and recommended that Kapiolani continue its recruitment efforts. (Defs.' Reply at 11-12). Langcaon accepted the committee's recommendation and informed Plaintiff of the decision. (Defs.' Reply at 12).
Plaintiff alleges that, during the conversation in which Langcaon informed Plaintiff that he was not selected, Langcaon "explained how sometimes people are promoted too high, beyond their ability to perform the job well. She said that [he] had excellent clinical skills and performed well, but [he] lacked management experience." (Pl.'s Decl. ¶ 57). Plaintiff states that he disagreed with her because he had five years of management experience at Kapiolani. (Pl.'s Decl. ¶ 57). Further, Langcaon has stated that she took into account Plaintiff's behavior in the meetings related to the resolution of his compliance complaint in making the decision that Plaintiff would not be selected for the Director's position. (Pl.'s Ex. D at 142:14-23). However, Langcaon explained that it was not the fact that Plaintiff kept the "transport issue alive" but that the kind of angry behavior that Plaintiff demonstrated at the meetings was not appropriate in management. (Pl.'s Ex. D at 143:1-10). The Court finds that questions of material fact exist as to whether the reasons offered for Kapiolani's decision not to select Plaintiff for the permanent Director position were pretextual.
[17] Plaintiff also alleges that during the first week of July 2002, Langcaon met with Plaintiff and indicated that "she would let [his interim director's] pay continue for three to six months after Chahanovich started" and that Langcaon also stated that "she recognized that [Plaintiff] would be continuing to doing [sic] everything while [Chahanovich] gots [sic] acclimated." (Pl.'s Decl. ¶ 159). However, Plaintiff alleges that on September 6, 2002, while out sick, he received his pay check and noted that his rate of pay had been decreased and "[t]here was no explanation as to why this had happened". (Pl.'s Decl. ¶ 189). Conversely, Defendants allege that "the duties traditionally associated with the director position were transferred to Chahanovich, and Plaintiff was no longer required to perform the duties that had been temporarily assigned to him while the position was vacant. Thus, the temporary salary differential associated with those duties was eliminated." (Defs.' Reply at 13).
[18] Defendants point to the fact that, in early May 2002, Langcaon complimented him for his analysis and presentation of staffing needs. (Defs.' Reply at 9). However, Plaintiff alleges that despite Langcaon's positive feedback, she stated that she was not going to approve Plaintiff's suggested changes because her "gut instinct" said no. (Pl.'s Decl. ¶ 153). Plaintiff further alleges that Langcaon directed him to have Chahanovich re-present Plaintiff's proposal to Langcaon when Chahanovich started as the new Director. (Pl.'s Decl. ¶ 153). Plaintiff claims that "[t]his forced [him] to personally cover staff work shifts and transport work shifts . . ." and that he "was forced to lumber through difficult work shifts with the bare minimum of appropriate staff to provide patient care." (Pl.'s Decl. ¶ 153). Defendants also emphasize that Langcaon solicited Plaintiff's opinion as to the best candidate to become the next director. (Defs.' Reply at 9).
[19] Because Plaintiff's claims of retaliation in violation of the EMTALA and the HWPA survive summary judgment based on his allegations regarding Langcaon's adverse treatment of Plaintiff (including her alleged refusal to respond to Plaintiff's inquiries, her public scolding of Plaintiff, and her reassignment of projects in such a manner as to impact his pay and employment evaluation), the Court will not address the additional adverse actions that Plaintiff alleges support his claims.
[20] The Court notes that Plaintiff also alleges that he suffered emotional distress as a result of being terminated from his employment with Kapiolani for theft. (Pl.'s Opp. at 32). On the other hand, Defendants state that Plaintiff removed five boxes of materials from the workplace without authorization. (Defs.' Mot. at 14). Defendants further explain that upon learning of Plaintiff's visit and his removal of the five boxes of materials, Kapiolani contacted Plaintiff and asked him to return the materials prior to terminating his employment. (Defs.' Mot. at 15).